## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 25 2016, 8:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

M.L.M.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner*

May 25, 2016

Court of Appeals Case No.
79A02-1510-JV-1795

Appeal from the Tippecanoe
Superior Court

The Honorable Faith A. Graham,
Judge

Trial Court Cause No.
79D03-1508-JD-132

**Crone, Judge.**

# Case Summary

M.L.M. appeals the juvenile court's order adjudicating him a delinquent child for committing an act that would be class A misdemeanor carrying a handgun without a license if committed by an adult. The evidence supporting M.L.M.'s commission of the offense was found during an investigatory stop and subsequent patdown search that M.L.M. claims violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. The sole restated issue presented for our review is whether the juvenile court abused its discretion in admitting into evidence the handgun found during the search. Finding no constitutional violation, we conclude that the juvenile court did not abuse its discretion. Therefore, we affirm the delinquency adjudication.

# Facts and Procedural History

On August 3, 2015, Sergeant Adam Mellady and Officer Jeff Tislow of the Lafayette Police Department were each dispatched to the Dollar General store on Main Street in response to a report of a "disturbance" and a "pending physical altercation." Tr. at 11, 37. An unidentified male called police and reported that he was inside the store and that several black males were outside waiting to "jump him." *Id*. at 11. When the officers arrived, Sergeant Mellady observed a group of males "huddled around, circled around what we would normally see in what they would do around a fight." *Id*. at 38. The group immediately started to disperse when they saw the officers. Sergeant Mellady recognized approximately eight people from the group, including sixteen-year-

old M.L.M., as members of a violent gang known as the "Stain Gang." *Id*. at 40. Sergeant Mellady recognized one individual in the group as having an outstanding arrest warrant. Sergeant Mellady exited his vehicle to speak to that individual and directed Officer Tislow to stop four members of the group who were attempting to exit the parking lot together. It "was still a very active situation" and the officers were unable to tell at that point what exactly had occurred and whether anyone was injured. *Id.* at 43. Sergeant Mellady explained:

> Based upon the complaint of a disturbance and a fight taking place and I'm arriving on the scene people automatically disperse; it's very common with what we deal with in fights and I needed them to stop to determine whether or not they were involved in the altercation.

*Id*. at 40.

[3] Of the four individuals that he ordered to stop, Officer Tislow recognized M.L.M. and another juvenile, A.T., as members of the Stain Gang. Officer Tislow had known M.L.M. for approximately five years during his work as a security officer with the Lafayette School Corporation, and also as a police officer. Most of the prior calls Officer Tislow had responded to regarding members of the Stain Gang involved large altercations and physical fights, which was consistent with what the unidentified caller had reported from inside the Dollar General store.

[4] Officer Tislow had M.L.M. and three other individuals sit on the curb in the parking lot while Sergeant Mellady was speaking with around four or five other individuals. Because the officers were "severely outnumbered," Officer Tislow just wanted to "keep the peace" while trying to figure out what was going on. *Id.* at 13-14. Officer Tislow did not have enough handcuffs for all the young men, so he used the only ones he had to restrain M.L.M. and A.T.

[5] Officer Tislow observed that M.L.M., while sitting on the curb handcuffed, was making furtive movements with his hands to the left side of his body as if he was trying "to discard" something that he did not want the officers to find. *Id.* at 15. Officer Tislow asked M.L.M. to stand up, and then asked him if he had anything on his person that the officers needed to know about. M.L.M. responded, "You're not going to like what I have on me." *Id.* As Officer Tislow began a patdown search of M.L.M., he saw in plain view the barrel of a gun facing up toward him in M.L.M.'s left front pants pocket. Officer Tislow removed the loaded handgun from M.L.M.'s pocket.

[6] The State filed a delinquency petition alleging that M.L.M. committed an act that would be class A misdemeanor carrying a handgun without a license if committed by an adult. M.L.M. filed a motion to suppress any evidence, i.e., the handgun, seized during the stop and patdown search. By agreement of the parties, the juvenile court held a consolidated suppression and delinquency hearing on August 31 and September 3, 2015. During the consolidated proceedings, the juvenile court denied the motion to suppress and proceeded to hear evidence on the delinquency allegation. On September 4, 2015, the

juvenile court entered its order adjudicating M.L.M. a delinquent for committing an act that would be class A misdemeanor carrying a handgun without a license if committed by an adult. This appeal ensued.

## Discussion and Decision

[7] Although M.L.M. asserts that the trial court should have granted his motion to suppress the handgun, because he now appeals following a completed trial, his assertion is better framed as a request for review of the trial court's ruling on the admissibility of the evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). The trial court has broad discretion when ruling on the admissibility of evidence, and we review its rulings only for an abuse of discretion. *Id*. We reverse only when the admission of evidence is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id*. "But when an appellant's challenge to such a ruling is predicated on an argument that impugns the constitutionality of the search and seizure of the evidence, it raises a question of law, and we consider that question de novo." *Id*. at 41 (citing *Kelly v. State*, 997 N.E.2d 1045, 1050 (Ind. 2013)).

## The warrantless stop and subsequent patdown search of M.L.M. did not violate the Fourth Amendment.[1]

[8]   The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." In general, the Fourth Amendment prohibits searches and seizures conducted without a warrant that is supported by probable cause. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). "Encounters between law enforcement officers and public citizens take a variety of forms, some of which do not implicate the protections of the Fourth Amendment and some of which do." *Id.* at 261. Consensual encounters in which a citizen voluntarily interacts with a law enforcement officer do not compel Fourth Amendment analysis. *Id.* "Nonconsensual encounters do, though, and typically are viewed in two levels of detention[.]" The first is a full arrest, which requires probable cause. *Id.* The second is a brief investigative stop, which requires a lower standard of reasonable suspicion. *Id.*

[9]   A brief investigative stop may be justified by reasonable suspicion that the person detained is involved in criminal activity. *Finger v. State*, 799 N.E.2d 528,

---

[1] M.L.M. also asserts that the warrantless stop and subsequent patdown search violated Article 1, Section 11 of the Indiana Constitution. However, other than a cursory reference to our state constitution in his written motion to suppress, he did not present a separate state constitutional argument to the trial court. "A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court." *Griffin v. State*, 16 N.E.3d 997, 1006 (Ind. Ct. App. 2014) (quoting *Showalter v. Town of Thorntown*, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009), *trans. denied*). Indeed, the rule of waiver protects the integrity of the trial court in that the trial court cannot be found to have erred as to an argument that it never had an opportunity to consider. *T.S. v. Logansport State Hosp.*, 959 N.E.2d 855, 857 (Ind. Ct. App. 2011), *trans. denied* (2012). Therefore, M.L.M.'s state constitutional claim is waived.

532 (Ind. 2003) (citing *Terry v. Ohio*, 392 U.S. 1, 31 (1968)). Specifically, in *Terry* the United States Supreme Court held:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30.

[10] Accordingly, limited investigatory stops and seizures on the street involving a brief question or two and a possible frisk for a weapon can be justified on mere reasonable suspicion. *Finger*, 799 N.E.2d at 533. However, "'[s]uch reasonable suspicion must be comprised of more than hunches or unparticularized suspicions.'" *Clark,* 994 N.E.2d at 263 (quoting *State v. Murray,* 837 N.E.2d 223, 225-26 (Ind. Ct. App. 2005), *trans. denied* (2006)). Taking into account the totality of the circumstances or the whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. *Id.* at 264. In making this determination, we must examine the facts as known to the officer at the moment of the stop. *Id.* Findings of reasonable suspicion are reviewed de novo, and this is necessarily a fact-sensitive inquiry. *Id.*

[11]    The parties here agree that the officers' detention of M.L.M. was a nonconsensual brief investigatory detention. M.L.M. asserts that the trial court abused its discretion in admitting the handgun into evidence because the officers lacked reasonable suspicion to justify the detention. Specifically, he argues that the tip from the unidentified caller lacked sufficient indicia of reliability to provide reasonable suspicion of criminal activity and that the police officers' observations did not suitably corroborate the tip. We disagree.

[12]    Our supreme court has noted that "an anonymous tip alone is not likely to constitute the reasonable suspicion necessary for a valid [*Terry*] stop." *Sellmer v. State,* 842 N.E.2d 358, 361 (Ind. 2006) (citation omitted). Similarly, the United States Supreme Court has stated that "'an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity'" because "'ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations,' and the anonymous tipster's veracity is 'by hypothesis largely unknown, and unknowable.'" *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). However, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable

suspicion to make the investigatory stop.'" *Florida v. J.L.,* 529 U.S. 266, 270 (2000) (citation omitted).[2]

[13] Here, the unidentified caller reported that a group of black males was waiting outside the Dollar General store with the purpose of physically assaulting him. When Sergeant Mellady and Officer Tislow arrived at the store, they were able to partially corroborate the tip when they personally observed a group of males huddled in a group as if surrounding a fight or altercation. As the group started to quickly disperse upon the sight of law enforcement, the officers could not yet discern whether a fight had occurred or whether anyone was injured. Both officers immediately recognized M.L.M. and approximately eight other individuals as members of a violent gang known for engaging in criminal activity including physical altercations. Sergeant Mellady also recognized one individual who had an outstanding arrest warrant. We conclude that the anonymous tip coupled with additional information that became available to the officers when they arrived at the scene was sufficient to provide reasonable suspicion for the officers to "freeze" the situation and investigate. *See Washington v. State*, 740 N.E.2d 1241, 1245 (Ind. Ct. App. 2000), *trans. denied* (2001). In other words, under the totality of the circumstances, the officers here had a particularized and objective basis to suspect that M.L.M. was engaged in

---

[2] The *J.L.* court distinguished between tips received from anonymous sources and those received from identified informants. *See* 529 U.S. at 270. Because anonymous tips are considered less reliable than tips from known informants, they "can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability, such as evidence corroborating the accuracy of the tip or additional reasons to suspect criminal activity." *State v. Gray*, 997 N.E.2d 1147, 1154 (Ind. Ct. App. 2013), *trans. denied* (2014).

criminal activity, and therefore his investigative detention was lawful under the Fourth Amendment.

[14] M.L.M. maintains that, even assuming that reasonable suspicion existed for the investigatory detention, Officer Tislow's additional patdown search of him was unlawful. "In addition to detainment, *Terry* permits a reasonable search for weapons for the protection of the police officer, where the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Malone v. State*, 882 N.E.2d 784, 786-87 (Ind. Ct. App. 2008). "Officer safety is of paramount importance. Police officers are daily placed in difficult and dangerous situations, some of which are life threatening. The law has to provide protections for such officers." *Id*. at 787. A patdown search is reasonable if the facts are such that a reasonably prudent person in the same circumstances would be warranted in believing that the police officer was in danger. *Hill v. State,* 956 N.E.2d 174, 177 (Ind. Ct. App. 2011), *trans. denied* (2012). In determining whether the officer acted reasonably under the circumstances, we consider the specific, reasonable inferences that the officer is entitled to draw from the facts in light of his experience. *Id.*

[15] There is no question that the officers here were concerned for their safety. Officer Tislow testified that, at the time of the initial detention, he and Sergeant Mellady were "severely outnumbered" and dealing with several known members of a violent gang, one of whom had an outstanding warrant. Tr. at 14. Officer Tislow stated that he was trying to keep an eye on the group of four

individuals sitting in front of him, which included M.L.M., while simultaneously trying to ensure Sergeant Mellady's well-being as Sergeant Mellady spoke with others. Officer Tislow testified that when he observed M.L.M. making furtive movements while sitting on the curb handcuffed near fellow gang members, it "drew concern to [him] for safety reasons." *Id.* at 23. He had learned from his training and experience that individuals try to discard items, such as weapons, that they do not want the police to discover. When Officer Tislow asked M.L.M. if he had anything on his person that the officers needed to know about, M.L.M. substantiated Officer Tislow's concerns by responding, "You're not going to like what I have on me." *Id.* at 15. Officer Tislow began a patdown of M.L.M.'s outer clothing, at which point he saw in plain view the barrell of a handgun in M.L.M.'s front pants pocket. Considering the reasonable inferences that Officer Tislow was entitled to draw from the facts in light of his experience, we conclude that he acted within the protective purpose of *Terry* in conducting a patdown search of M.L.M.

[16] In sum, we conclude that the officers here had reasonable suspicion to justify both the investigatory stop of M.L.M. and the subsequent patdown search for weapons. Therefore, the trial court did not abuse its discretion when it admitted the handgun into evidence. M.L.M.'s delinquency adjudication is affirmed.

[17] Affirmed.

Najam, J., and Robb, J., concur.